UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| KIRBY McZEKE, | ) | Civil Action No.: 4:10-2944-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| HORRY COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.     INTRODUCTION

This action arises out of Plaintiff's employment with the Horry County Magistrate's Office in Loris, South Carolina. Plaintiff asserts a cause of action for race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Presently before the Court is Defendant's Amended Motion for Summary Judgment (Document # 56).[1] A hearing was held on July 16, 2013. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.     FACTS

### A.     Plaintiff's Employment

In 1977, Plaintiff, a black female, began working at the Horry County Magistrate's Office

---

[1]Defendant originally filed a Motion for Summary Judgment and, following a telephone conference with Plaintiff and the undersigned, filed the present Amended Motion for Summary Judgment, which incorporated the original Motion. Therefore, the undersigned entered an Order finding the original Motion for Summary Judgment moot.

in Loris (the Magistrate's Office) on a part-time basis under a job training program.  Pl.  Dep. pp. 15-16.  Plaintiff worked in a different job outside Horry County from 1980 until 1984 and then returned to the Magistrate's Office as a full-time Clerk until her termination in August 2009.  Pl. Dep.  pp. 17-18.  During her tenure at the Magistrate's Office there were typically two full-time Administrative Assistants, one would handle the civil docket and the other the criminal matters. Plaintiff was assigned the criminal docket.  Pl. Dep. p. 24.

Judge Harry McDowell supervised Plaintiff for most of her career.  Pl. Dep. p. 22.  Judge McDowell served as the Loris Magistrate from 1977 until his retirement on June 30, 2007. McDowell Dep. p. 7.  Judge McDowell considered Plaintiff an "excellent employee" who did not have any performance problems.  McDowell Dep. p. 9; see also Pl. Dep. pp. 54-55.  Judge McDowell secured the commitment of his eventual replacement, Judge Mark Harris, to keep Plaintiff in her position until she was eligible to retire.  McDowell Dep. pp. 16-17.

Judge Mark Harris, a white male, assumed the Loris Magistrate's job on July 1, 2008.  Harris Dep. pp. 6-7. For the one-year period between Judge McDowell's resignation and Judge Harris' election and installation, there was not a resident Magistrate Judge in the City of Loris. Plaintiff and a co-employee, Vicki Aldridge, continued to perform their daily duties with other county Magistrates appearing as needed to conduct court proceedings. Ms. Aldridge retired in approximately November of 2007 and for a period of time Plaintiff was the only daily presence in the Loris Magistrate Office. Pl. Dep. p. 34.  In December 2007, Ms. Susan Johnson, a white female, was transferred to the office to assume the job duties of Ms. Aldridge.  Plf Dep. pp. 24-25.  In July and August of 2008, Judge Harris spent most of his working time outside of the office undergoing training for his new duties. Pl. Dep. p. 26.

Upon his arrival, Judge Harris rarely spoke to Plaintiff but would send directions to Plaintiff through Ms. Johnson. Pl. Dep. pp. 39-40, 107. Judge Harris allowed Ms. Johnson to sign off on hearing notices, but did not allow Plaintiff to do so. Id. Judge Harris also identified Ms. Johnson as the "office manager" instead of Plaintiff on a form he provided to the South Carolina Summary Court Judges' Association. Pl. Dep. pp. 108-110 and Ex. 4. He also critiqued Plaintiff's work, and "tr[ied] to find things on [her]." Pl. Dep. p. 107.

Judge Harris did have one meeting with Plaintiff and Ms. Johnson in early September of 2008, soon after he finished his training. Pl. Dep. pp. 41-42. Judge Harris informed them that he planned to hold civil and criminal court at 9:00 a.m. on Monday mornings. Pl. Dep. p. 41. He also informed them that he wanted them to be cross trained in both the criminal and the civil responsibilities in the office. Pl. Dep. p. 42. Ms. Johnson informed him that Plaintiff was already cross trained because she had worked in the office alone for several months prior to Ms. Johnson's arrival. Id. During the meeting, Judge Harris also discussed his expectations regarding their lunch breaks. Id. At that time, people started coming into the office, so the meeting ended. Pl. Dep. p. 43.

**B.    September 2008 Suspension**

In September 2008, Plaintiff was charged by Judge Harris with a two-day suspension based on two separate incidents. The first incident involved a citizen by the name of Don Herring. In June of 2008, Officer Stephenson approached Plaintiff in the Loris office asking if she knew Don Herring. Id. Plaintiff explained that she knows Don Herring and he was supposed to be coming by to handle an eviction matter. Id. Officer Stephenson asked Plaintiff to alert him immediately upon Mr. Herring appearing at the office, inform Mr. Herring of a bench warrant pending against him, and

hold him until Officer Stephenson got there so that he could serve a warrant at the Magistrate's Office.  Pl. Dep. pp. 74-75.  Right before 5:00pm, Herring came by the Loris office.  Id.  Plaintiff told Herring there was a bench warrant for his arrest and that Officer Stephenson was looking for him.  Pl. Dep. pp. 74-81.  She told Herring that Officer Stephenson asked her to hold him there until Officer Stephenson could get there to serve the warrant on him but that she did not have any holding power and was about to go home.  Id.  Herring explained that his lawyer supposedly took care of the matter involving the bench warrant.  Id.  Plaintiff told him that he needed to go by the solicitor's office  the next morning to resolve the matter.  Id.  Plaintiff never informed Officer Stephenson that Herring was in the office nor did she advise him of her conversation with Herring.  Id.  Herring's lawyer had not taken care of the issue as represented by Herring, and on August 13, 2008, Officer Stephenson appeared at Herring's home at 6:00 p.m. to personally serve the warrant.  Herring acknowledged to Officer Stephenson that he had discussed the existence of the warrant with Plaintiff.  Harris Dep. pp. 51-53; see also Stephenson Statement (attached as Ex. A to Defendant's Motion).

The second incident stemmed from a home invasion in June 2008 involving Plaintiff's sister and her family.  Pl. Dep. pp. 55-56.  Multiple perpetrators broke into their home and tied up the children and interrogated the sister.  Id.  They pistol-whipped both Plaintiff's sister and brother-in-law and abducted the brother-in-law looking for money.  Id.  In July or August, Plaintiff called the police on behalf of her sister to check on the progress of their investigation into the incident.  Pl. Dep.  pp. 57-60, 67.  The police stated they were not investigating the matter but assured Plaintiff they would look into it.  Id.  In September, Plaintiff called Captain Rhodes upset that the home invasion was not being investigated.  Id.  The Captain told Plaintiff the investigation

was closed because it was drug related.  Id.  Plaintiff explained that regardless of whether it was drug

related or not, an entire family was tied up and beaten and her family would "sue the hell" out of

Horry County if nothing was done and the men came back again.  Id.  She had a similar conversation

with Lieutenant Kevin Duke.  Pl. Dep. p. 67.

After reviewing the two incidents, Judge Harris determined that disciplinary action was

appropriate. As he was new to his position, he contacted Chief Magistrate Whitley to discuss the

matters.  Harris Dep. p. 64.  In September 2008, Judge Whitley appeared at the Loris office and went

to Judge Harris' office.  Pl. Dep. pp. 68-69.  Judge Whitley called Plaintiff into Judge Harris' office

and asked if she knew Don Herring.  Id.  Plaintiff explained that Don Herring was the son of a friend

and also does business in the Loris office.  Id.  During the meeting, Plaintiff explained that she did

nothing wrong involving Don Herring. Pl. Dep. pp. 74-81.  Judge Harris determined that a two-day

suspension was appropriate under the circumstances.  Judge Harris had previous experience serving

warrants and testified that he had served hundreds while working for the Department of Probation,

Parole, and Pardon Services.  Judge Harris testified, "[i]t's easier to serve a person within an office

setting than it is to serve him at a residence. The chance of confrontation is higher at the residence

than it would be within the office and it's just an easier process to serve a warrant in a more secure

setting than it is at a residence."  Harris Dep. p. 71.

In the write-up for Plaintiff's suspension, Judge Harris described the two violations as "[t]he

use of abusive language towards a fellow employee or member of the general public while

performing official duties as a County employee" and "divulging or misusing confidential

information."  Disciplinary Report (attached as Ex. B to Defendant's Motion). Judge Harris noted

that "Ms. McZeke divulged information on a General Sessions Bench Warrant to the defendant and

further elaborated "I believe that she told him that he had a bench warrant and that he needed to go down and take care of it, which was not her place to say it. It was improper for her to divulge the information in the first place." Id.   Judge Harris further stated that "Ms. McZeke also called and used abusive language to Lt. Kevin Duke of the Horry County Police Department concerning an ongoing investigation." Id.  The Disciplinary Report indicated "Consequences should incident occur again: TERMINATION." Id., Harris Dep. p. 72.

In her response to the Disciplinary Report, Plaintiff acknowledged the incident with Lt. Duke and stated "I'm in agreement with the abusive language suspension, not in agreement with the divulging information on a General Sessions Bench Warrant." Disciplinary Report.  However, Plaintiff acknowledges in her written response that she informed Herring of the warrant and that she never contacted Officer Stephenson to alert him that she had done so. Id.

Plaintiff asserts that it was common knowledge amongst the employees that Judge Whitley would transfer an employee targeted for termination to traffic court (under his direct supervision), so that he could fire them for the slightest infraction. Pl. Dep. pp. 93-96, 209-210.  After the suspension, Judge Harris told Plaintiff that she was going to be transferred to traffic court the following Monday. Id.  Concerned citizens contacted Senator Elliot about Plaintiff's transfer, and Senator Elliot met with Judge Harris.  After this meeting, Judge Harris changed his position on the transfer.  Pl. Dep. pp. 96-106 & Def. Ex. 2.

### C    Anton Graham Incident

On April 20, 2009, Officer Bernard Grate appeared before Judge Harris to request an arrest warrant for Anton Graham.  Judge Harris and Officer Grate came to Plaintiff's desk and Harris told her to do the warrant. Plaintiff and Anton Graham's mother, Johnnie Mae Graham, are friends.

Officer Grate, who knows the family and knows Plaintiff's connection, began discussing Anton and the Graham family. Plaintiff prepared the warrant in the new CMS computer system, it was signed by Judge Harris, and a copy was given to Officer Grate.  Pl. Dep. pp. 120-130.

Approximately the next day or so, officers went to Johnnie Mae's home early in the morning with an arrest warrant looking for Anton and searched the home.  Johnnie Mae called Plaintiff around lunch time later that day and told her that the cops came by her house with an arrest warrant, searched the premises and said to have Anton contact them. Plaintiff explained to Johnnie Mae that Anton must turn himself in to the police and she told her that the nature of the warrant was drug related. During each subsequent conversation with Johnnie Mae, Plaintiff urged her to have Anton turn himself in.  Pl. Dep., pp. 135-144.

Plaintiff called Judge Butler while off duty and asked if he could give a reduced bond should Anton turn himself in. Soon thereafter, Plaintiff was conducting business at the detention center and stopped by Judge Butler's office to say that Anton did not turn himself in so not to worry about a reduced bond. Judge Butler said to leave the matter alone, which she did.  Pl. Dep. pp. 144-148.

Anton Graham did not immediately surrender. Judge Harris later learned that while he was still at-large, a confidential informant telephoned Officer Grate to inform him that Anton Graham had contacted him and suspected that he was participating with law enforcement in securing Graham's arrest.  Harris Dep. pp. 107-108.  The matter was eventually referred to SLED for an investigation, based in part upon Judge Harris' belief that Plaintiff had warned either Anton Graham or Mrs. Graham that a warrant pending against him prior to any attempted service by the officers. Harris Dep. pp. 115-118. Plaintiff provided a sworn statement to the SLED investigators in which she admitted that Mrs. Graham contacted her sometime after the officer arrived at her house with the

arrest warrant and that she informed Mrs. Graham that the arrest warrant involved drug charges.

Plaintiff denied providing Mrs. Graham with information regarding the warrant prior to the officers

arriving at Mrs. Graham's house.  Plaintiff also acknowledged in the sworn statement that she

discussed the bond with Judge Butler.  Voluntary Statement (attached as Ex. C to Defendant's

Motion).  Plaintiff testified that she spoke with the solicitor regarding the investigation against her

and he informed her that "he didn't find anything." Pl. Dep. pp. 242-243.  During his deposition,

Judge Harris testified that he did not believe Plaintiff's statement that she did not inform Mrs.

Graham of the warrant before it was served.  Harris Dep. pp. 114-116.

Judge Harris testified that he put considerable thought into what course of action he should

take given Plaintiff's second incident involving divulging warrant information to unserved criminal

defendants.  Harris Dep. pp. 90-98.  One option he considered was transferring Plaintiff to the traffic

court; however, the Director of Public Works would not approve a transfer due to the nature of the

offense.  Harris Dep. p. 96.  Judge Harris consulted with Judge Whitley who recommended

termination. Judge Harris then determined that he would give Plaintiff the option to resign her

position which would not foreclose future employment with Horry County, an option not available

if Plaintiff was terminated.  Harris Dep. p. 97.

On August 18, 2009, Judge Harris met with Plaintiff and informed her of his decision.  Pl.

Dep. pp. 177-178; Harris Dep. pp. 97-98.  Plaintiff requested the rest of the day to consider her

options; however, she did not notify Judge Harris of her decision that day. Pl. Dep. p. 181.  The next

day, Plaintiff appeared for work and again met with Judge Harris. She informed him that she would

not voluntarily resign. He informed her that she was terminated and presented her with a termination

letter.  Termination Letter (attached as Ex. D to Defendant's Motion).  Plaintiff was  replaced by

Karen Maldett, a white female,  from Judge Whitley's office.  Pl. Dep. pp. 181-182.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary

judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving

party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may

not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary

judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on

must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."

Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere

allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324.  Rather, the party must present

evidence supporting his or her position by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.     DISCUSSION

Plaintiff alleges that Defendant discriminated against her because of her race. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff has not produced direct evidence of race discrimination and, thus, must proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination. Id. To establish a prima facie case of race discrimination in a termination case, the plaintiff must present facts showing that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F. 3rd 277, 285 (4th Cir. 2004).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a

legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs

v. Burdine, 450 U.S. 248, 254 (1981). This is merely a burden of production, not of persuasion. St.

Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate,

nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson

Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens,

460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a

preponderance of the evidence that the legitimate reason produced by Defendant is not its true

reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden

shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant

intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the

ultimate burden of presenting evidence from which a reasonable jury could conclude defendant

intentionally discriminated against her.

In its Motion for Summary Judgment, Defendant argues that summary judgment is

appropriate because Plaintiff was not performing her job duties at a level that met her employer's

legitimate expectations at the time of her termination, and, thus, fails to present a prima facie case

of race discrimination.[2] Defendant argues that Plaintiff's actions in revealing the existence and

nature of criminal arrest warrants created unnecessary difficulties and complications for the law

enforcement officers responsible for serving the warrants and that her conduct in attempting to

negotiate the surrender of a fugitive was wholly inappropriate given her position as a court official.

---

[2]It is undisputed that Plaintiff meets the other three requirements of the prima facie case. She is a black female, her employment was terminated, and her position was filled by a white female.

The record reveals that Plaintiff was suspended in September of 2008 for "the use of abusive language towards a fellow employee or member of the general public while performing official duties as a County employee" and for "divulging or misusing confidential information." Disciplinary Report.  Later, in August of 2009, she was terminated for "inappropriate conduct with those outside the office as it relates to a criminal defendant, the release of confidential information to a member of the defendant's family and the fact that [she] attempted to intervene in bond matters related to the defendant's criminal charges."  Termination Memo.

With respect to her suspension, Plaintiff agreed that it was not proper for her to use abusive language when speaking with officers in the police department.  However, she denied divulging or misusing confidential information with respect to the general sessions bench warrant.  She argues that Officer Stephenson asked her to tell Herring about the bench warrant, and she did.  Although she did not keep Herring there and call Officer Stephenson as he had requested that she do, this conduct was not included on the Disciplinary Report as part of her violation.

In addition, as to her termination, Plaintiff denies providing any information regarding the Anton Graham warrant until after officers had attempted to serve the warrant at his mother, Johnnie Mae Graham's house.  She admits that when Johnnie Mae contacted Plaintiff to ask her about the warrant, Plaintiff told her that it was drug related.  Plaintiff also admits to contacting Judge Butler to inquire about a reduced bond.

However, Plaintiff argues that the conduct for which her employment was terminated was similar to the conduct in which she engaged without incident while previously working for Judge McDowell.  Judge McDowell testified that a warrant is no longer confidential once it is signed and put into the computer system.  McDowell Dep. p. 20.  Judge McDowell also testified that members

of the community would call and request information regarding a warrant and that the policy in the

office was to provide the information only if it was already in the computer. Id. Additionally, Judge

McDowell testified that members of the community, including employees, frequently called to ask

for a reduced bond for a particular individual and he did not feel it was inappropriate for an

employee to do so. McDowell Dep. pp. 15-16. Judge Livingston also testified that it was common

for others, including employees, to request a reduced bond for someone and it was not against any

policy of which she was aware. Livingston Dep. pp. 33-34. Thus, in the light most favorable to

Plaintiff, the behavior for which she was suspended and the behavior for which she was terminated

were acceptable to her previous supervisor and to at least one other Judge in the County.

In contrast, Judge Harris testified that it was not proper for Plaintiff to divulge information

on a warrant until it had been served because the warrant does not become public until then. Harris

Dep. pp.39, 69, 72. It appears that Judge Harris' expectations were different than those of Plaintiff's

previous supervisor, Judge McDowell, under whom she had worked for twenty-five years. However,

based upon the facts in this case, Plaintiff's knowledge of this expectation is important in

determining whether the expectation was reasonable or legitimate. Judge Harris testified that he

informed the employees in his office that whatever occurred within that office was to remain

confidential and that they were not to disclose it. Harris Dep. pp. 39-40.[3] Judge Harris' testimony

as to the expectations he communicated to his staff is vague at best. Furthermore, Plaintiff asserts

that Judge Harris never communicated to her his expectations regarding confidentiality within the

_____

[3]However, the two instances for which Plaintiff was suspended, her conversation with
Herring regarding the outstanding warrant against him and her phone calls to Captain Rhodes and
Lieutenant Duke, occurred in June of 2008, during the interim between Judge McDowell's
retirement on June 30, 2007, and Judge Harris' installation on July 1, 2008.

office.  She states in her deposition,

> The thing of it is, if Judge – if Judge Harris wanted to change policies and procedures in his office, he had – he's had many opportunities to do that.  Whenever he called the first meeting with Susan and I, did he mention anything about, well, we're not going to do things the way that we used to do, that you all used to do; we're going to do it this was and that way, okay?  But did he do that?  No.  So the only thing I can go on is what I've known for 25 years, okay?

Pl. Dep. p. 200.  Thus, issues of fact exist as to whether Judge Harris ever communicated to Plaintiff or anyone else his expectations regarding confidentiality or any other practices that might have differed from Judge McDowell's, and, even if he did, what exactly was included within those expectations.

Defendant argues that, even if Judge Harris did not directly communicate to Plaintiff that all matters that occurred within the office were to remain confidential, Plaintiff should have been on notice of that expectation once she received the suspension in September of 2008.  However, the reason for her suspension was somewhat vague.  With respect to the confidentiality issue, the Disciplinary Report states only that Plaintiff divulged or misused confidential information when she "divulged information on a General Sessions Bench Warrant to the Defendant."  Disciplinary Report. When read in context with Plaintiff's actual conduct (as set forth in the record) of notifying Herring that he had an outstanding Bench Warrant, the reasonable inference from her suspension is that Judge Harris expected Plaintiff not to disclose to individuals the existence of an outstanding warrant. Her subsequent action of notifying Mrs. Graham that her son's warrant involved drug activity does not involve the disclosure of the existence of an outstanding warrant because, viewing the facts in the light most favorable to Plaintiff, Mrs. Graham was already aware of the existence of the warrant. At the least, reasonable jurors could differ as to the extent of Judge Harris' expectations based upon

-14-

the Disciplinary Report.  Further, an issue of fact exists as to whether Plaintiff was on notice that her

conduct with regards to the Anton Graham warrant fell below Judge Harris' expectations.  In

addition, there is no evidence in the record regarding Judge Harris' expectations regarding her

involvement in bond matters.

Therefore, for the reasons discussed above, a dispute of fact exists as to whether Plaintiff

meets a prima facie case of discrimination and, thus, the burden shifts to Defendant to produce a

legitimate, non-discriminatory reason for the termination.  Defendant points to the termination

memorandum prepared by Judge Harris at the time of Plaintiff's termination, in which he states,

> This termination results from inappropriate contact with those outside the office as
> it relates to a criminal defendant, the release of confidential information to a member
> of the defendant's family and the fact that you attempted to intervene in bond matters
> related to the defendant's criminal charges.  Accordingly, you have been removed
> from the employ of Horry County on the date specified above.

Termination Letter (attached as Ex. D to Defendant's original Motion for Summary Judgment).

With the production of these reasons for Plaintiff's termination, the burden returns to Plaintiff to

present sufficient evidence to create a genuine dispute of fact that these reasons were not Defendant's

true reasons for her termination but, rather, were pretext for a discriminatory reason.  As stated

above, the ultimate burden remains with Plaintiff to present sufficient evidence to show that

Defendant terminated her employment because of her race.

Plaintiff argues that Defendant's reason for her termination is unworthy of credence because

she did nothing wrong with respect to Anton Graham and was cleared of any criminal wrongdoing

following a SLED investigation into the matter.  Defendant argues that Judge Harris expected

employees in his office to keep all matters confidential.  However, it is unclear as to what exactly

Judge Harris expected to remain confidential.  As discussed above, a question of fact exists as to the

extent of Judge Harris' expectations.

What Judge Harris' expectations and policies were prior to Plaintiff's termination[4] is critical to this case.  Other than the Disciplinary Report documenting Plaintiff's suspension, the only evidence of Judge Harris' expectations and policies is his deposition testimony.  There is no evidence of any prior establishment of his expectations or policies.  In the light most favorable to Plaintiff, Judge Harris did not communicate any expectations or policies, either in writing or verbally, prior to the termination of Plaintiff's employment.  This case is somewhat unusual because there is little history of Judge Harris applying his expectations and policies since he was new to his position. Further, according to his testimony and the reasons stated for Plaintiff's termination, his expectations and policies differed from those of his predecessor and others in his position.  Thus, with respect to whether the reasons given for Plaintiff's termination, i.e., violations of Judge Harris' expectations and/or policies, were the true reasons for her termination, absent concrete evidence of Judge Harris' expectations and policies, this case largely involves the weighing of his credibility, a function for the factfinder.

Still, "the law does not require an employer to make, in the first instance, employment choices that are wise, rational, or even well-considered, as long as they are nondiscriminatory." Id. (citing Powell v. Syracuse Univ., 580 F.2d 1150, 1156–57 (2d Cir.1978).  Thus, Plaintiff's termination is actionable under Title VII only if the termination was based upon Plaintiff's race.

Plaintiff presents evidence that Judge Harris treated Plaintiff differently and with less respect than he afforded Plaintiff's co-worker, Ms. Johnson, a white female, even though Plaintiff had

---

[4] That is, whether the conduct that lead to Plaintiff's termination was in violation of Harris' established expectations and policies.

worked in that office much longer than Ms. Johnson.  As set forth above, Judge Harris rarely spoke

to Plaintiff but would send directions to Plaintiff through Ms. Johnson.  Pl. Dep.  pp. 39-40, 107.

Judge Harris allowed Ms. Johnson to sign off on hearing notices, but did not allow Plaintiff to do

so.  Id.  Judge Harris also identified Ms. Johnson as the "office manager" instead of Plaintiff on a

form he provided to the South Carolina Summary Court Judges' Association.  Pl. Dep. pp. 108-110

and Ex. 4.  In addition, following Plaintiff's termination, Judge Harris replaced her with a white

female.

Plaintiff also produces evidence that Judge Whitley, the Chief Magistrate Judge for Horry

County, exhibited dislike towards Plaintiff and tried to get rid of her on multiple occasions when she

worked for Judge McDowell.  Judge McDowell testified that Judge Whitley did not like Plaintiff and

wanted Judge McDowell to fire her but Judge McDowell told him "you run your office and I'll run

mine."  McDowell Dep. pp. 13-15.  However, Judge McDowell does not testify that Judge Whitley

wanted him to fire Plaintiff because of her race.  Rather, he states Judge Whitley "just didn't like

her."  McDowell Dep. p. 13.  Judge McDowell also testified that there was "bad blood" between

Judge Whitley and Judge Livingston, a black, female judge.  McDowell Dep. pp. 12-13.  Thus,

Plaintiff's conclusion that Judge Whitley held some sort of racial animus against African-American

individuals is based upon the facts that he disliked Plaintiff, a black female, and there was "bad

blood" between him and Judge Livingston, another black female.  To be sure, this circumstantial

evidence is weak.

Nevertheless, to be actionable under Title VII, any racial bias must come from the relevant

decisionmaker.  Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 291(4th Cir.

2004). "[A]n employer will be liable not for the improperly motivated person who merely influences

the decision, but for the person who in reality makes the decision." Id.  For any racial bias on the part of Judge Whitley to be relevant, Plaintiff must present evidence sufficient to show that he "possessed such authority as to be viewed as the one principally responsible for the decision . . . ." Id.  No such evidence exists in the record.  Although Judge Whitley was the Chief Magistrate Judge for Horry County, there is no evidence that he had the authority to terminate the employment of an individual working under the supervision of another Magistrate Judge.  Plaintiff's termination letter was signed by Judge Harris.  Termination Letter.  Additionally, although Judge Harris testifies that he discussed with Judge Whitley various options regarding Plaintiff's employment following the Anton Graham incident, he does not testify that Judge Whitley ever recommended termination much less made the decision to terminate her employment.  Harris Dep. pp. 90-97.  Thus, to the extent Judge Whitley held any racial bias, it is not actionable here because Judge Whitley did not make the decision to terminate her employment.

Finally, Plaintiff produces the unsworn Affidavit of Bert Brown, an African-American man who was the Human Resource Director for Horry County from April of 1987 until December of 2007.  Brown Affidavit ¶¶ 2-3 (attached as an Exhibit to Plaintiff's original Response).  Brown avers that it was his experience that "a culture of racial favoritism towards white employees exists with Horry County and the Horry County Magistrates offices."  Id. at ¶ 6.  However, aside from the fact that Brown's Affidavit is not a sworn statement, as discussed above, because Plaintiff's supervisor was Judge Harris and Judge Harris made the decision to terminate Plaintiff's employment, any racial animus must come from him.  When Judge Harris became a Magistrate Judge in 2008, Brown was no longer employed with the county.  Therefore, his perception of racial favoritism within Horry County is not relevant to whether Judge Harris terminated Plaintiff's employment because of her

race.

Thus, the evidence in the record regarding whether Judge Harris held any racial animus towards Plaintiff is limited to his treatment of Ms. Johnson as compared to his treatment of Plaintiff and the fact that he hired a white employee to replace her. In the light most favorable to Plaintiff, Judge Harris rarely spoke to Plaintiff, sent instructions for her through Ms. Johnson, did not allow Plaintiff to sign hearing notices but did allow Ms. Johnson, and listed Ms. Johnson as the office manager on a form. He also replaced her with a white employee. Although this evidence of racial animus towards Plaintiff is weak, a reasonable juror could conclude that Judge Harris terminated her employment because of her race. As such, summary judgment is not appropriate.

## V.    CONCLUSION

To survive summary judgment, Plaintiff must present more than a scintilla of evidence to support her claim. While this case is weak, the credibility determination discussed above coupled with the evidence of disparate treatment of Plaintiff compared to her white co-worker and her replacement by a white employee are sufficient to preclude summary judgment. Therefore, it is recommended that Defendant's Motion for Summary Judgment (Document # 56) be denied.

> s/Thomas E. Rogers, III
> Thomas E. Rogers, III
> United States Magistrate Judge

August 8, 2013
Florence, South Carolina